PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-2747

———————

UNITED STATES OF AMERICA

v.

THURMOND ALLEN,

Appellant

———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 08-cr-00741-1)
District Judge: Honorable Joel H. Slomsky

———————

Argued April 20, 2010

———————

Before: SCIRICA,[*] AMBRO
and ALARCON,[**] <u>Circuit Judges</u>

(filed: August 17, 2010 )

Keith M. Donoghue (argued)
Brett G. Sweitzer
David L. McColgin
Federal Community Defender Office
Suite 540 West – Curtis Center
601 Walnut Street
Philadelphia, PA 19106
     *Counsel for Appellant*

Laurie Magid (argued)
Robert A. Zauzmer
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
     *Counsel for Appellee*

---

[*] Judge Scirica was Chief Judge of the Court at the time this appeal was argued. He completed his term as Chief Judge on May 4, 2010.

[**] The Honorable Arthur L. Alarcon, Senior Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

Thurmond Allen appeals an order of the District Court denying his motion to suppress evidence seized while he and others were detained by a police SWAT team during execution of a search warrant at a bar where Allen worked as a security guard. The warrant, issued in conjunction with a homicide investigation unrelated to Allen or to anyone else at the bar, authorized collection of security videotapes. The District Court concluded that because the bar was located in a high-crime area, because firearm-related crimes had been committed there, and because persons possessing firearms were known to patronize the bar, it was reasonable for the police to detain persons there while executing the warrant. Allen contends on appeal that this detention was an illegal seizure under the Fourth Amendment, and thus his statements to police and the evidence obtained as a result of that detention should have been suppressed.

We examine the limits of the Supreme Court's decisions in *Michigan v. Summers*, 452 U.S. 692 (1981), and *Los Angeles County v. Rettele*, 550 U.S. 609 (2007) (*per curiam*). After considering these cases and precedent of our own, and giving deference to the District Court's findings of fact, we conclude that Allen's detention did not violate the Fourth Amendment. Thus we affirm.

3

I.

The District Court found the following facts after an evidentiary hearing on Allen's motion to suppress. On May 10, 2008, an individual named Jimmy Ortiz was murdered in Allentown, Pennsylvania, and police obtained reliable information that the persons involved had retreated to a bar called Trinkle's Café ("Trinkle's"). Based on this information, the police obtained a search warrant at approximately 4:00 p.m. on Thursday, May 15, 2008, authorizing them to collect any security videos in the bar that could be used to identify the murder suspect. No Trinkle's owner or staff member was suspected of involvement in the homicide.

The police were familiar with Trinkle's and its location. It was in a high-crime area involving firearms and drugs, and customers of it often had histories of engaging in violence, firearm possession, and drug activity. In January 2008, four months before the Ortiz homicide, someone was shot inside Trinkle's, and a few weeks prior to the Ortiz homicide an individual was arrested for illegally possessing a firearm inside the bar. In addition, prior to the homicide, the owner and staff of Trinkle's were "uncooperative" with police during investigations of other incidents.[1] Given these facts, the police

_____

[1] For example, one of the officers testified that when police collected security videos from Trinkle's in connection with the January 2008 homicide, the bar's owner "became very uncooperative and angry that we had, in fact, taken that video equipment."

4

decided to use the Allentown Emergency Response Team, known as a SWAT team, to execute the warrant.

They did so at approximately 8:00 p.m., about four hours after obtaining the warrant, and secured the premises inside and outside the bar. Five people — including Allen, who was on duty as a Trinkle's security guard — were standing directly in front of the bar. The SWAT team, wearing armor and with guns drawn, ordered them to lie face down on the sidewalk with their hands in front of them, and explained that they would be detained just long enough to ensure the officers' safety and for the officers to gather the evidence they were seeking.

Allen was lying next to an individual named Robbie Trader, who told one of the officers that he had a firearm. The officer took the firearm, verified that Trader had a permit to carry it, and returned it to Trader, who was released. Allen then volunteered to one of the officers that he too had a firearm. The officer searched him, seized the gun, and inquired if he had a permit for it. Allen responded that he had an expired, out-of-state permit. When asked, Allen provided a false name, Christopher Williams. The police learned Allen's real name from someone who worked at the bar, and Allen was arrested. It was subsequently disclosed that he had a prior felony conviction.

A grand jury in the Eastern District of Pennsylvania returned a one-count indictment, charging Allen with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). He moved to suppress evidence of the firearm and his statements to the police as fruits of an illegal seizure. Following an evidentiary hearing, the District Court

denied the motion in an oral ruling, concluding that pursuant to *Summers* a "search warrant implicitly carries with it a limited authorization to detain occupants of the place of the search and to minimize the risk of harm to the officers," and that pursuant to *Rettele* the officers "took reasonable actions to secure the premises and to ensure their own safety and the efficacy of the search." Moreover, the Court found that Allen voluntarily revealed to the police that he was armed. Following the denial of the motion to suppress, Allen pled guilty to the charge in the indictment, but preserved his right to appeal the District Court's ruling on the suppression motion. The Court sentenced Allen to 41 months' imprisonment, a term of three years' supervised release, a fine of $1,000, and a special assessment of $100. He filed a timely appeal.

II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, which grants to district courts "original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." We have jurisdiction under 28 U.S.C. § 1291.

"We review the district court's denial of [a] motion to suppress for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts." *United States v. Lafferty*, 503 F.3d 293, 298 (3d Cir. 2007) (*quoting United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

III.

Allen argues that his detention outside Trinkle's violated his Fourth Amendment rights, and so his statements to police and the seized firearm should have been suppressed as fruits of the illegal detention. However, based on the Supreme Court's treatment of *Summers* in its decision in *Rettele*, the officers were permitted to detain those outside Trinkle's during the execution of the search warrant. Accordingly, given that Allen's detention was legal, and given its factual finding that Allen volunteered to police that he had a firearm before being searched, the Court did not err when it denied Allen's motion to suppress.[2]

---

[2] The District Court found also that the "officers had sufficient, specific and articulable facts to believe that persons who frequented the bar could be armed and dangerous," and thus ruled that (1) "it was reasonable for [them] . . . to seize persons in the area for an investigative stop *and then do a limited search for concealed weapons*," and (2) "it was reasonable to stop, *pat down* and investigate these persons . . . ." (App. 322-23 (emphases added).) On this record, we question whether the police would have been permitted to pat down everyone they encountered at Trinkle's. *See, e.g., United States v. Ritter*, 416 F.3d 256, 269 (3d Cir. 2005) (holding that "absent a reasonable belief or suspicion that *an individual* encountered is armed," a person may not be patted down, even when he or she is "encountered on the premises of property to be searched during the course of executing a search warrant") (emphasis added). However, the District Court made no finding regarding whether officers patted down the individuals they detained outside Trinkle's, and, more importantly, made no finding that Allen

7

We begin by noting that *Summers* itself is largely distinguishable from our case. There, police officers were about to execute a warrant to search a house for narcotics when they encountered Summers descending the front steps. 452 U.S. at 693. The officers requested Summers's assistance in gaining entry to the house and then detained him while they searched the premises. *Id.* They found drugs in the basement, and after confirming that Summers owned the house, they arrested him, searched him, and found in his coat pocket an envelope containing heroin. *Id.* Summers was charged with possession of the heroin, and he sought to suppress the heroin found on him as the product of an illegal search. *Id.* at 694.

The Court framed the "dispositive question" as "whether the initial detention of [Summers] violated his constitutional right to be secure against an unreasonable seizure," and concluded that his detention was constitutionally permissible because it was not overly intrusive and three law enforcement interests (noted below) supported the detention. *Id.* at 694, 701-04. The detention was not overly intrusive primarily because the police had obtained a valid warrant to search for contraband, meaning that a "neutral and detached magistrate had found probable cause to believe that the law was being violated in that house," and so "a substantial invasion of the privacy of the

---

himself was patted down before volunteering that he had a gun. In addition, Allen does not argue that he was illegally searched, only that his detention was illegal. Thus, the issue of whether the police would be justified in conducting a limited search of the detained persons for concealed weapons is not before us in this appeal, and we do not reach it.

8

persons who resided there" was already authorized. *Id.* at 701. Thus, "[t]he detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself." *Id.* In other words, the "articulable facts" of the detention supported its legality, because a "judicial officer ha[d] determined that police ha[d] probable cause to believe that someone in the home [was] committing a crime," and the connection of Summers to the home gave the "officer[s] an easily identifiable and certain basis for determining that suspicion of criminal activity justifie[d] a detention of" Summers. *Id.* at 703-04.

The three law enforcement interests the Court identified as supporting the detention were: (1) "preventing flight in the event that incriminating evidence is found;" (2) "minimizing the risk of harm to the officers" (because "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence"); and (3) "the orderly completion of the search" (because an occupant's "self-interest may induce [him] to open locked doors or locked containers to avoid the use of force" that can be damaging to property). *Id.* at 702-03.

*Summers* itself is largely off point; it relied heavily on the fact that the warrant authorized a search for contraband, which meant that there was reason to believe that crimes were taking place in the home, which in turn allowed the detention of its resident. Here, a neutral and detached magistrate did not find probable cause to believe that violations of law were occurring at Trinkle's. The magistrate found only that there was probable cause to believe that evidence, in the form of security videotapes that might implicate the murder suspects, could be found at the

9

bar. Allen's detention thus did not involve contraband that was likely to implicate him in criminal activity, and his connection to the bar did not give the officers "an easily identifiable and certain basis for determining that suspicion of criminal activity justifie[d]" his detention. *Id.* at 703-04. Indeed, the *Summers* Court specifically stated that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." *Id.* at 704-05. This reasoning does not apply here, where the search warrant merely sought evidence of a crime at a public establishment and that evidence was unrelated to any of the individuals then present there.

As for the law enforcement interests identified in *Summers*, the Government does not argue that preventing flight in the event that incriminating evidence is found justified Allen's detention, and for good reason — the police were at Trinkle's simply to collect security videotapes, they had no reason to believe that Allen had any involvement in the Ortiz homicide, and they had no reason to believe that Allen would flee.

In addition, the detention of Allen did not advance an orderly completion of the search, as there was no indication that Allen even knew where the videotapes were located. While the Government argues that he was an employee "who could potentially assist the police . . . [and] could have directed the police to the security equipment" (Appellee's Br. at 32), there is no evidence that the police ever attempted to have Allen assist them in this way. The Government further contends that the

10

detention of Allen was justified by a "possible concern about the destruction of evidence given that the bar's staff had been hostile and uncooperative when law enforcement had previously sought to obtain the exact same type of evidence." (*Id.* at 31.) But given the number of officers present at the bar and that they did not suspect any of the bar's ownership or staff of playing a role in the Ortiz homicide, the risk of destruction of evidence was slight.

The only law enforcement interest relevant to our case, and indeed the only part of the *Summers* Court's reasoning that is applicable to the facts here, is minimizing the risk of harm to the officers. Indeed, the District Court relied solely on this interest in denying Allen's motion to suppress. We conclude that it was correct to do so because, per *Rettele*, in certain situations safety concerns alone may authorize a brief detention of the occupants of an establishment during execution of a search warrant, and the distinction between a search for contraband and a search for evidence is largely immaterial.

In *Rettele*, police investigating a fraud and identity-theft crime ring obtained a search warrant for two houses where they believed they could find the suspects, four African-American individuals. The warrant authorized the police to search the homes and three of the suspects, one of whom was known to own a registered handgun, for documents and computer files. 550 U.S. at 610. However, one of the homes had been sold, and when the police arrived to execute the warrant, they found a Caucasian family at the home. Nonetheless, the police entered the house with guns drawn, ordered the 17-year-old son they encountered at the door to lie face down on the ground, and ordered the couple they found in the bedroom to get out of bed

11

despite their wearing no clothes. The couple was held at gunpoint for one to two minutes before being allowed to dress (and a few minutes thereafter to sit on the couch in the living room). The police then realized their mistake, apologized, and left the house. *Id.* at 611.

A civil action under 42 U.S.C. § 1983 followed, asserting a violation of Fourth Amendment rights. The Supreme Court concluded there was no violation, holding that "[w]hen officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, . . . the Fourth Amendment is not violated." *Id.* at 616. The Court concluded that "[t]he orders by the police to the occupants, in the context of this lawful search, were permissible, and perhaps necessary, to protect the safety of the deputies," because "[b]lankets and bedding can conceal a weapon, and one of the suspects was known to own a firearm." *Id.* at 614. The Court noted that "'[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.'" *Id.* at 615 (*quoting Summers*, 452 U.S. at 702-03). It even concluded that the discrepancy between the race of the suspects and the persons in the house was immaterial, because "[t]he presence of some Caucasians in the residence did not eliminate the possibility that the suspects lived there as well." *Id.* at 613. Moreover, the *Rettele* Court ruled this way despite the warrant at issue authorizing a search for mere evidence, and not contraband. *Id.* at 610.

*Rettele*'s treatment of *Summers* compels the conclusion that Allen's detention did not violate his Fourth Amendment rights. First, the police here were executing a valid search warrant for evidence at a bar located in a high-crime area, where

patrons were known to carry firearms, and where several firearm-related crimes had recently been committed, just as the police in *Rettele* were executing a search warrant for evidence at the home of an individual known to own a licensed firearm. Under these circumstances, the police were justified in "tak[ing] reasonable action to secure the premises and to ensure their own safety and the efficacy of the search," *id.* at 614, including detaining those present at gunpoint. Second, several people were present at Trinkle's, and so the police were justified in taking a "moment to secure the [premises] and ensure that other persons were not close by or did not present a danger."[3] *Id.* at

---

[3] As Allen points out, the risk of harm to the officers here was at least in part created by the decision to execute the warrant at 8:00 p.m. on a Thursday night, when the bar was likely to be busy. Allen contends that "[i]t would have been far more reasonable to visit Trinkle's during off hours, at which time the only persons present would be ownership, staff, and perhaps [a] stray patron," perhaps intimating that an ulterior motive was behind the timing of the execution of the warrant. (Appellant's Br. at 22-23.) We agree with Allen that the timing is puzzling. However, while the record does not reveal how long the police had their information before applying for the warrant, they did execute the warrant only hours after it issued, perhaps to minimize the chance that the security videotapes would get recorded over. Regardless, "[w]hether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (internal quotation and

13

615. Finally, just as the brief duration of the detention in *Rettele* was deemed reasonable under the circumstances, the detention here was just long enough for the police to ensure their safety and collect the evidence they sought. Moreover, in *Rettele*, "[t]here is no accusation that the detention here was prolonged." *Id.*

Allen contends that our decision in *Leveto v. Lapina*, 258 F.3d 156 (3d Cir. 2001), in which we concluded that the detention at issue was unreasonable,[4] requires us to find a Fourth Amendment violation here. However, without trivializing being held on the ground at gunpoint, the detention in *Leveto* was far more intrusive than Allen's detention here. There, agents of the Internal Revenue Service, as part of an investigation into a doctor's tax practices, carried out a search warrant at the doctor's office, detained him and his wife for almost eight hours, restricted them from communicating with others for the entire period, continually interrogated them, subjected the doctor to "the inconvenience and indignity of a forced ride with IRS agents to his home and back to his office," and "prevented [him] from responding to client needs." *Id.* at 160, 169.

---

citation omitted). On this evidence, we cannot say that the police action here was objectively unreasonable under the circumstances.

[4] While the *Leveto* Court held that plaintiffs "successfully alleged . . . violations of their Fourth Amendment rights," judgment was entered in favor of the defendants because they "were entitled to qualified immunity due to uncertainty in the case law." 258 F.3d at 160.

14

Additionally, we ruled in *Leveto* that "there was no compelling need to detain Dr. Leveto to protect the safety of the agents," because it was not an investigation "into a type of offense often accompanied by violence." *Id.* at 171. But, as noted above, *Rettele*, decided after *Leveto*, counsels that protecting the safety of the agents alone can justify a reasonable detention of an individual during execution of a search warrant.

Finally, Allen points out our noting in *Leveto* that while an "articulable and individualized suspicion" of criminal activity can exist "when law enforcement officers have a valid warrant to search a home for contraband and the detainee is an occupant of the home . . .[,] the same may not be true if the search warrant merely seeks evidence." *Id.* at 171-72 (*citing Summers*, 452 U.S. at 703-05 & n.20). However, as explained above, *Rettele* rendered the evidence/contraband distinction immaterial where occupants of a building are detained to ensure the safety of the officers executing a search warrant. Here again *Rettele* supersedes *Leveto*.

In short, our decision today is not controlled by *Leveto*. Following *Rettele*, we conclude that Allen's Fourth Amendment rights were not violated when the police briefly detained him during execution of the search warrant at Trinkle's.[5]

---

[5]  Allen raises an additional argument in this appeal, that the felon-in-possession statute, 18 U.S.C. § 922(g)(1), is unconstitutional on its face and as applied to the facts of this case. In *United States v. Gateward*, 84 F.3d 670 (3d Cir. 1996), we upheld "the constitutionality of § 922(g)(1) as a valid exercise of the commerce power," *id.* at 672, and in *United*

15

\* \* \* \* \*

We hold that Allen's brief detention during execution of the search warrant at Trinkle's did not violate his rights under the Fourth Amendment. Accordingly, we affirm the ruling of the District Court denying his motion to suppress.

---

*States v. Singletary*, 268 F.3d 196 (3d Cir. 2001), we "reaffirm[ed] our holding in *Gateward*," and ruled that "proof . . . that the gun had traveled in interstate commerce, at some time in the past, was sufficient to satisfy the interstate commerce element." *Id.* at 197, 205. Absent *en banc* review, we may not revisit these decisions, and therefore reject Allen's challenge to the constitutionality of § 922(g)(1).

16