IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 18-60335

United States Court of Appeals
Fifth Circuit

**FILED**

April 12, 2019

Lyle W. Cayce
Clerk

IKECHUKWU HYGINUS OKORIE, M.D.,

      Plaintiff - Appellant

v.

VIRGINIA M. CRAWFORD, M.D.; CHARLES D. MILES, M.D.; RICKEY L. CHANCE, D.O.; CLAUDE D. BRUNSON, M.D.; JOHN C. CLAY, M.D.; S. RANDALL EASTERLING, M.D.; C. KENNETH LIPPINCOTT, M.D.; WILLIAM S. MAYO, D.O.; J. ANN REA, M.D.; H. VANN CRAIG, M.D.; JONATHAN DALTON; LESLIE ROSS,

      Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Mississippi

Before WIENER, SOUTHWICK, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

*Michigan v. Summers,* 452 U.S. 692, 705 (1981), allows law enforcement to detain the occupant of a residence where a criminal search warrant is being executed. Consistent with the touchstone of the Fourth Amendment, however, the scope of such detentions must be reasonable. *Id.* at 705 n.21; *Heitschmidt v. City of Houston*, 161 F.3d 834, 838 (5th Cir. 1998).

We confront a question that courts have rarely had to address in the nearly four decades since *Summers* was decided: May the government detain

No. 18-60335

the owner of a business that is being searched not because of suspected criminal activity but instead for possible civil violations?

This question arises from the search of a medical clinic that resulted in the doctor being detained for three to four hours. During that time, an investigator pushed the doctor down, drew his gun multiple times, and limited the doctor's movement and access to facilities such as the restroom. We conclude that the doctor's allegations establish a Fourth Amendment violation based on the intrusiveness of the detention, but that the sparse caselaw in this area had not clearly established that unlawfulness. As a result, the investigator is entitled to qualified immunity.

## I.

### A.

Dr. Ikechukwu Okorie is a primary care physician who runs a clinic in Hattiesburg. The Mississippi State Board of Medical Licensure certified Okorie to prescribe opioids and other pain medications. In 2010, the Board began investigating whether Okorie was overprescribing those substances. It instructed Okorie to implement policy changes and returned a year later to check on him. Despite concluding that Okorie was not complying with the Board's instructions, it continued to allow Okorie to prescribe opioids. The following year, the Board again found Okorie was overprescribing opioids and other controlled substances. This time it revoked his certification.

Okorie sought recertification in 2014 after completing new pain management training. He received a temporary license, but the Board requested additional information and asked Okorie to appear at its next meeting to assist in its final determination.

Before the Board met, a state court judge authorized an administrative inspection and issued a search warrant. *See* MISS. CODE § 41-29-157(a)(1); *see also Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–24 (1978) (discussing the

difference between probable cause required for a criminal search warrant and what is required for an administrative search).  The affidavit supporting the warrant cited probable cause to believe evidence was present in the clinic related to laws allowing the revocation and denial of licenses to practice medicine and regulating controlled substances.  *See* MISS. CODE §§ 73-25-29, 73-25-83, 41-29-113 *et seq.*  No criminal sanctions are associated with any of the cited provisions.  The primary evidence the warrant sought was medical records.

In evaluating what happened when the warrant was executed, we must assume Okorie's allegations to be true as this case is just at the pleading stage. *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015). According to his complaint and Rule 7 supplement to that pleading, a large team made up of the following executed the warrant: five Board investigators, a Mississippi Bureau of Narcotics agent, a Hattiesburg High Intensity Drug Trafficking Agent, and two federal DEA agents.  On entering the clinic, Board investigator Jonathan Dalton brandished his gun and pushed Okorie into his office.  He then served Okorie with the warrant.  After reviewing the warrant, Okorie attempted to leave his office to discuss it with his staff.  Dalton stopped Okorie.  He pushed Okorie down while saying, "if you don't sit down I will put you down!"  Okorie feared for his life.  Dalton eventually allowed Okorie to instruct his staff to fax the warrant to his lawyers and print the requested patient records.  But while Okorie did so, Dalton stood next to him with his gun drawn.

Once Okorie briefly spoke with his staff, Dalton brought him back into his office, where Okorie was detained for the remainder of the search.  After two hours had passed, Okorie asked to go to the bathroom and was told no. Okorie "plead[ed]" with Dalton, explaining that he would have to urinate himself if not allowed to use the restroom.  At this point, Dalton, "with his gun

drawn," escorted Okorie to the bathroom. Dalton forced Okorie to leave the bathroom door open the entire time, even though a female investigator and other individuals were present. Dalton also instructed Okorie to keep his hands where Dalton could see them. Only when the agents were done executing the search, three to four hours after it began, was Okorie allowed to leave the clinic.[1]

### B.

Okorie filed this section 1983 lawsuit in federal court alleging violations of the Fourth Amendment. The complaint names 12 defendants. The district court dismissed the claims against all of them for various reasons. Only the claim against investigator Dalton is being appealed.[2]

Dalton filed a motion to dismiss on the pleadings invoking qualified immunity. *See* FED. R. CIV. P. 12(c). He argued that the complaint did not allege a constitutional violation because he had probable cause to detain Okorie and he did not detain him in an unreasonable manner. After allowing Okorie to supplement his allegations with a Rule 7 response, *see Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc), the district court granted the motion and dismissed the claim against Dalton. It held there was no constitutional violation and ruled in the alternative that any violation would not be clearly established.

### II.

---

[1] After the search, the Board commenced disciplinary proceedings against Okorie and found him in violation of Board rules. The Board later charged Okorie with violating the terms of the first disciplinary proceeding and suspended him for a year. *See* 739 F. App'x 301 (5th Cir. Oct. 9, 2018).

[2] Among the numerous rulings not being appealed, the district court granted absolute immunity to the members of the Mississippi Board of Medical Licensure on the grounds that they were acting in a judicial function in their dealings with Okorie. The court also dismissed Okorie's state law claims under the Mississippi Tort Claims Act, holding that he did not comply with the statutory notice requirements. Finally, the district court dismissed claims against another Board investigator because Okorie did not sufficiently allege that she was directly involved in his detention.

No. 18-60335

We first decide whether Okorie alleges a violation of his rights. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (allowing courts to first address either the constitutional question or whether qualified immunity is overcome). This is the third case in the past year to reach our court alleging constitutional violations in connection with an administrative search of a medial office, *see Barry v. Freshour*, 905 F.3d 912 (5th Cir. 2018); *Zadeh v. Robinson*, 902 F.3d 483 (5th Cir. 2018), so addressing the constitutional issue will provide guidance for this increasingly common tactic. *See Pearson*, 555 U.S. at 236 (noting that a need to develop the law may counsel in favor of deciding the underlying constitutional question before considering the immunity defense).

## A.

Okorie first argues that there was no basis to detain him at all. As mentioned at the outset, it has long been the case that law enforcement may detain the occupant of a place where a criminal search warrant seeking contraband is being executed. *Summers*, 452 U.S. at 705. *Summers* is an exception to the normal Fourth Amendment rule requiring probable cause to seize a person. *Id*. at 696–700. But Okorie points to two features of the search of his clinic that are different from the search in *Summers*: (1) his warrant was based on probable cause for civil violations, not criminal ones, and (2) it sought evidence, not contraband.

The latter distinction may have helped Okorie at one time. *Summers* involved a search for illegal drugs and noted that its rule might not extend to allowing seizures when police are searching only for evidence. *Id*. at 705 n.20. We once took a narrow view of *Summers*, reading it as "merely hold[ing] that the police have limited authority to detain the occupant of a house without probable cause . . . when police are executing a validly executed search warrant for contraband." *Heitschmidt*, 161 F.3d at 838; *see also Williams v. Kaufman*

5

No. 18-60335

*Cty.*, 352 F.3d 994, 1008 (5th Cir. 2003) (explaining that *Heitschmidt* limited *Summers* to its facts).[3]

But since then the Supreme Court has applied *Summers* to allow the seizure of occupants of a residence where officers were searching for "documents and computer files." *Los Angeles Cty. v. Rettele*, 550 U.S. 609, 610–11, 614 (2007) (per curiam). In cases decided both before and after *Rettele*, all but one circuit to address the issue have rejected a contraband/evidence distinction for the *Summers* exception. *See Archer v. Chisholm*, 870 F.3d 603, 610, 618 (7th Cir. 2017) (warrant for documents, emails, and records); *Stepnes v. Ritschel*, 663 F.3d 952, 958, 961 (8th Cir. 2011) (warrant for documents); *United States v. Allen*, 618 F.3d 404, 405, 409 (3d Cir. 2010) (warrant for security footage); *Unus v. Kane*, 565 F.3d 103, 110, 120–21 (4th Cir. 2009) (warrant for documents); *Dawson v. City of Seattle*, 435 F.3d 1054, 1058, 1066 (9th Cir. 2006) (warrant to search for rat infestation).[4] What is more, treating searches for evidence and contraband the same is consistent with the modern rejection of the "mere evidence" rule that once pervaded Fourth Amendment doctrine. *See generally Warden v. Hayden*, 387 U.S. 294 (1967). And the governmental interests that justified *Summers*'s exception to the probable cause requirement—including officer safety and "preventing flight in the event that incriminating *evidence* is found," 452 U.S. at 702 (emphasis added)—are

---

[3] *Heitschmidt* actually involved a search for evidence, not contraband. *Heitschmidt*, 161 F.3d at 839. Although the court noted this, it ultimately held that none of the *Summers* factors were supported by legitimate police interests in the case. *Id.* The court thus did not need to decide whether *Summers* applied to searches for evidence.

[4] Only the Tenth Circuit arguably upholds the distinction. But its concern is not with run-of-the-mill criminal search warrants for evidence, but with searches of a truly innocent third party, who possesses useful evidence but whose possession of such evidence is not a crime. And the court takes a broad definition about what constitutes contraband, including in that category a wide range of nontraditional items that look more like evidence. *See, e.g.*, *United States v. Ritchie*, 35 F.3d 1477, 1483 (10th Cir. 1994). It has not revisited its analysis post-*Rettele*. *See also Denver Justice and Peace Comm. v. City of Golden*, 405 F.3d 923, 931 (10th Cir. 2005) (discussing the scope of *Summers* and *Ritchie*).

not necessarily greater in a search for contraband than in a search for evidence. We thus agree with the prevailing view that *Summers* applies when the warrant is seeking evidence.

But the factors supporting the *Summers* exception do not weigh as strongly in the government's favor when it is executing an administrative search warrant as compared to a criminal one. So Okorie's civil/criminal distinction has more force.

One big difference relates to the Supreme Court's observation that the existence of a criminal search warrant provides an "objective justification" for seizing an occupant. *Summers*, 452 U.S. at 703; *see Alexander v. City and Cty. of S.F.*, 29 F.3d 1355, 1363 (9th Cir. 1994), *abrogated on other grounds*, *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017). That justification exists, *Summers* explained, because the search warrant required a judicial determination of "probable cause to believe that someone in the home is committing a crime," meaning it is not much of a leap to suspect that an occupant may be involved in that criminal activity. *Summers*, 452 U.S. at 703–04 (explaining that the "connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant"). In other words, the level of suspicion surrounding an occupant of a home where a criminal warrant is being executed is not that far removed from the probable cause that allows a warrantless arrest. *See United States v. Watson*, 423 U.S. 411, 423–24 (1976) (authorizing warrantless arrests based on probable cause).

This transitive theory of suspicion to detain does not work for a search warrant seeking evidence only of civil violations. Even if the suspicion of ongoing regulatory violations at a business can similarly be transferred to the owner of that business, probable cause (or even certainty) of a civil violation generally does not allow a warrantless arrest. *See Brown v. Texas*, 443 U.S.

47, 51 (1979) (explaining that "'probable cause' to believe that the suspect is involved in *criminal* activity" is required for an arrest and reasonable suspicion "that the individual is involved in *criminal* activity" is required for the lesser intrusion of a *Terry* stop) (emphasis added).[5]  This fundamental distinction between criminal and civil violations—that people can always be detained without a warrant if there is probable cause  for violating criminal laws, *see Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) (allowing arrest for traffic violation because it was a misdemeanor)[6]—casts significant doubt on *Summers*'s application to administrative searches.[7]

Other factors *Summers* relies on in finding that detention was only an "incremental intrusion on" the resident's liberty interest, 452 U.S. at 703, may not be absent in the administrative context, but they are less pronounced. *Summers* observes that detention during execution of a criminal search warrant is "less intrusive than the search itself" as most occupants would want to stay and observe as their possessions are searched.   *Id.* at 701.

---

[5] The few cases allowing arrests for civil violations do not recognize general authority for *warrantless* arrests.  Courts have allowed arrests for civil violations based on bench warrants issued for civil contempt, *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998), or analogous court orders, *see United States v. Phillips*, 834 F.3d 1176 (11th Cir. 2016) (allowing civil arrest based on writ of bodily attachment judge issued for failure to pay child support, which under Florida law requires proof by a preponderance of civil contempt).  Another "civil" context in which arrests are allowed involves the statutory authority to make arrests for immigration violations.  *See City of El Cenizo v. Texas*, 890 F.3d 164, 189 (5th Cir. 2018).  Although removal proceedings fall on the civil side of the docket, the Supreme Court has repeatedly noted their close relationship with criminal proceedings.  *See, e.g., Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 (2018) (applying criminal "vagueness" standard to removal statute).

[6] If the government can make warrantless arrests based on sufficient suspicion of regulatory violations, *Atwater* would not have needed to spend pages addressing whether the pre-founding English common law and founding-era American practice allowed warrantless arrests for misdemeanors.  532 U.S. at 327–338.

[7] Unlike this case, *Dawson v. City of Seattle*, 435 F.3d 1054 (9th Cir. 2006), involved a warrant based on probable cause of not just civil public health violations but also criminal ones.  *Id.* at 1062.  It thus does not address the application of *Summers* to warrants based only on suspicion of civil violations.

No. 18-60335

Administrative inspections are typically a more limited and regular occurrence than execution of a criminal search warrant,[8] which led one court to conclude that "citizens may well find it much *more* intrusive to be detained than to have their houses inspected for possible noncompliance with health and building codes." *Alexander*, 29 F.3d at 1362. This observation that the stakes are usually lower for administrative searches than for criminal ones also affects the likelihood that someone present during the search will hide evidence or respond with violence. *Summers*, 452 U.S. at 702–03. Although concerns about safety and evidence destruction are lessened in the administrative context, we recognize they still exist. But because most of the reasons the Supreme Court gave for creating the *Summers* exception are absent or minimized when an administrative search is being executed, it is far from clear that the rule categorically extends to the civil context.[9]

## B.

But we need not resolve whether detention incident to execution of an administrative warrant is allowed as a general matter, because we conclude that the intrusiveness of this one rendered it unconstitutional. As is true of other Fourth Amendment seizures such as *Terry* and traffic stops, the lawfulness of a detention incident to execution of a warrant is not evaluated only at its inception; the length and intrusiveness of the detention may render it unreasonable. *Muehler v. Mena*, 544 U.S. 93, 100 (2005) (noting that the

---

[8] The length and intrusiveness of the search of Okorie's clinic does not fit this description. But we are addressing whether as a categorical matter *Summers* applies to administrative searches.

[9] Two other courts, albeit in unpublished opinions, expressed similar doubts. *See Onofre-Rojas v. Sessions*, 2018 WL 4471026, at *1 (9th Cir. Sept. 18, 2018) (per curiam) (noting that many of the *Summers* rationales do not hold true for administrative warrants); *Hamilton v. Lokuta*, 1993 WL 460784, at *4 (6th Cir. 1993) (per curiam) (holding that the *Summers* rationales did not justify a detention pursuant to an administrative search); *but see Ruttenberg v. Jones*, 283 F. App'x 121, 136–37 (4th Cir. 2008) (per curiam) (citing *Rettele* and *Summers* for the proposition that it was not *per se* unreasonable for officers to order patrons of a club against a wall during a warrantless administrative inspection).

duration of a detention can impact its lawfulness); *Heitschmidt*, 161 F.3d at 838–39 (holding that a *Summers* detention was unreasonably prolonged and intrusive); *cf. United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (explaining that a traffic stop can be challenged as unlawful at its inception or as unreasonably "related in scope to the circumstances that justified the stop" (citing *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968))).   Also borrowing from *Terry* principles, we evaluate whether the scope of a *Summers* detention was reasonable by examining if the purposes that allowed the detention in the first place continued to support the seizure for its duration. *See Muehler*, 544 U.S. at 100–01.

One side of the reasonableness balance is the scope of the detention, which depends on the detention's location, length, and degree of intrusiveness. *See Heitschmidt*, 161 F.3d at 837–38.  The detention of Okorie at his medical office, in the sight of his staff, is more significant than a detention at home which, as a private location where the resident is most comfortable, adds "only minimally to the public stigma associated with the search itself."  *Summers*, 452 U.S. at 702.  That being said, although the detention occurred in a public office, it was a clinic Okorie owned, thereby perhaps adding only minimally to the public stigma that would already exist from the search itself.  *See Daniel v. Taylor*, 808 F.2d 1401, 1404 (11th Cir. 1986) (per curiam).  Also, even absent his detention, Okorie had good reason to stay at the office while the search was conducted so he could assist with and observe what was occurring.  *Id.*; *contrast Williams v. Kaufman Cty.*, 352 F.3d 994, 1010 (5th Cir. 2003) (addressing intrusion on the liberty interest of night club patrons with no personal interest in the place who were forced to remain in the club for the entirety of the search).  But unlike in any of the cases just cited, Okorie's clinic was subject only to an administrative search.  The stigma attached to a regulatory inspection and search, a more common occurrence that often does not even

require warrants, *see Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978); *Beck v. Tex. Bd. of Dental Exam'rs*, 204 F.3d 629, 638 (5th Cir. 2000), is substantially less than the stigma associated with a criminal search. So the incremental intrusion resulting from Okorie's public detention is much greater than that resulting from the *Summers* detention on both ends of the comparison: The stigma of the search itself is less and that flowing from the detention in a public place is more. Overall, the setting of the search makes Okorie's detention more intrusive than the *Summers* detention.

Okorie's detention lasted for three to four hours. In a post-*Summers* case, the Supreme Court held that two to three hours of handcuffed detention during a search was reasonable, but that was an "inherently dangerous" search for weapons and a gang member. *Muehler*, 544 U.S. at 100. Because reasonableness is always a matter of context, that holding does not automatically support an even longer detention related to execution of an administrative warrant for medical records at a location where there is no hint of violent activity. Indeed, we have expressed concern about a four-hour detention related to a criminal search for evidence of a prostitution ring. *Heitschmidt*, 161 F.3d at 838.[10] Although officers typically can detain persons present for the full length of the search, the "prolonged" detention here, in the context of the relatively low level of danger attached to searching a medical clinic, supports a finding of unreasonableness.

Weighing even more heavily in Okorie's favor is the method of detention. This factor was critical to our holding that a seizure was unreasonable when

---

[10] *Heitschmidt* was decided before *Muehler*. *Muehler* held that law enforcement interests supported detaining the plaintiff for two to three hours, the full duration of the search. 544 U.S. at 100. But *Muehler* still allowed that the "duration of a detention can, of course, affect" the objective reasonableness of the officer action. *Id.* And later cases have continued to look at the duration of the detention as a factor in deciding the objective reasonableness of the detention. *See Rettele*, 550 U.S. at 614; *Allen*, 618 F.3d at 409.

the detainee was physically pushed onto a car trunk, handcuffed in the street, then detained in pain without a restroom break for more than four hours. *Id.* 838. Not all of these features are present here (Okorie was not handcuffed, for example), but the force applied and displayed against Okorie is a much greater intrusion on liberty than what happened to the *Summers* detainee, who was "merely asked to remain at the home until the search was completed." *Id.* Okorie's detention involved forceful pushing, with Dalton yelling "if you don't sit down I will put you down!" Dalton then drew his gun while escorting Okorie into the hallway so Okorie could instruct his staff to fax the warrant to his lawyers and print patient records as requested. And while Okorie did eventually get to use the restroom, he had to plead repeatedly to do so, crying and telling Dalton he was going to urinate himself. On his way to the restroom, Okorie was escorted by Dalton with his "gun drawn," required to keep his hands visible, and forced to leave the door open the entire time, even though there were many people nearby. Brandishing a gun during a visit to the restroom—long after the clinic was secured—is a far cry from ordering a resident to stay in the house while a search is completed.

Against these substantial intrusions on Okorie's liberty we consider the government's interest in detaining him in this manner throughout the search. *Muehler*, 544 U.S. at 98, 100 (recognizing that detention prevents flight and evidence destruction, protects officer safety, and expedites the search). For some of the reasons we have already discussed in considering whether even an initial detention is allowed in connection with an administrative search, the law enforcement interest is not as great as it is with searches for evidence of crimes. For starters, it is hard to imagine that a concern about flight is in play when it comes to a search for violations of state medical regulations. Jail time is what people typically flee from. Similarly, if not quite eliminated, the threat of evidence destruction is reduced for someone whose business is subjected to

an administrative search as compared to someone whose home is being searched for evidence that may end up landing the person in prison. We agree with the district court that there was still some basis to be concerned that Okorie might interfere with the search for documents and potential interviews of witnesses—his career was at stake even if jail time was not—but that could have been prevented with less intrusive measures.

Even more damaging for Dalton is the lack of any indication that Okorie posed a safety threat to officers, especially after the office was initially secured. *See New York v. Class*, 475 U.S. 106, 117 (1986) ("When the officer's safety is less directly served by the detention, something more than objectively justifiable suspicion is necessary to justify the intrusion if the balance is to tip in favor of the legality of the governmental intrusion."). Okorie did not have a violent background, had no ties to a violent organization, and was not accused of committing a violent crime (or any crime for that matter). *See Heitschmidt*, 161 F.3d at 838. Though law enforcement has understandable safety concerns when initially securing any scene, *cf. Bailey v. United States*, 568 U.S. 186, 195 (2013) (noting that *Summers* recognizes a need to "secure the premises" and for officers to take "command of the situation"), that would not seem to support hours-long detention of nonviolent individuals present at an administrative search. Yet Dalton allegedly drew his gun while accompanying Okorie and made him keep his hands visible at all times, even two hours into the detention. By this point, concerns about safety did not justify such intrusive measures. And with nine agents present in the office to execute the search, the need for such an intrusive detention was even lower. *Compare Heitschmidt*, 161 F.3d at 839 (noting that, with ten to twelve officers on the scene, the plaintiff could have been effectively restrained in a far less intrusive manner), *with Muehler*, 544 U.S. at 100 (noting that the case involved the

No. 18-60335

detention of four people suspected of being dangerous by two officers, meaning governmental interests in a forceful detention were at their maximum).

The last of the government's interests does weigh in favor of Dalton, though only mildly so. Detaining Okorie could help facilitate the search, as investigators relied on him to print patient records for review. But again, what matters is not just the detention, but the *way* a detention is carried out. *See Heitschmidt*, 161 F.3d at 839. Nothing indicates Okorie would have been uncooperative had he not been detained, and certainly nothing indicates that a drawn gun was necessary to keep Okorie restrained.

Balancing the relatively minor benefits to law enforcement of this detention against the serious intrusions it imposed on Okorie's liberty, the allegations establish an unreasonable seizure. Going forward, an hours-long detention of a person during an administrative search of a medical clinic or similar establishment, during which a gun is drawn, will be unlawful absent heightened security concerns.

### III.

But looking backward, the law in this undeveloped area was not clear enough when Dalton detained Okorie so that "any reasonable official in the defendant's shoes would have understood that he was violating" the Fourth Amendment. *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). Dalton thus has a qualified immunity defense.

We have previously acknowledged that the limits of *Summers* are not well defined. *Williams*, 352 F.3d at 1011–12. Not many cases in our circuit have addressed when a *Summers* detention becomes unreasonably intrusive. *Heitschmidt* is the only one that holds a detention-incident-to-search unconstitutional.[11]   161 F.3d at 839.   And it does not place the

---

[11] Nor could we find such cases in other circuits that would establish a robust consensus that the detention in this case was unreasonable.

14

No. 18-60335

unconstitutionality of Okorie's detention "beyond debate" because Okorie was not painfully detained in handcuffs during his detention as Heitschmidt was for four-and-a-half hours.  *Plumhoff*, 572 U.S. at 779.  That was a, if not the, critical factor in *Heitschmidt*'s finding the detention unreasonable.  161 F.3d at 838–39.  Another unreasonable aspect of the *Heitschmidt* detention— officers never let the plaintiff visit the bathroom—is absent here.  Because this detention was less intrusive than the one in *Heitschmidt*, that case alone does not establish that the "violative nature of this *particular* conduct is clearly established."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The only feature that arguably makes Okorie's claim a stronger one than Heitschmidt's is that this detention was incident to an administrative seizure. As we have discussed, that at a minimum affects the balancing of *Summers*'s interests in analyzing the intrusiveness of a detention even if it does not outright eliminate the government's right to detain without probable cause. But we have never considered the question, and only a few other courts have. The dearth of caselaw on this question might indicate the government rarely detains people while executing administrative searches, a fact that would be consistent with Okorie's view of the Fourth Amendment.  The consequence, though, is that Okorie is unable to point to caselaw clearly establishing the unlawfulness of this type of detention.  As a result, qualified immunity defeats Okorie's claim.  *al-Kidd*, 563 U.S. at 741.

\* \* \*

The judgment of the district court is AFFIRMED.

15